Hillsborough-northern judicial district
No. 2006-481

SARAH EVERITT

v.

GENERAL ELECTRIC COMPANY & a.

Argued: April 5, 2007
Opinion Issued: September 21, 2007

*Thomas Craig, PA*, of Manchester (*Thomas Craig* and *David Woodbury* on the brief, and *Mr. Woodbury* orally), for the plaintiff.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Donald E. Gardner* and *Donald L. Smith* on the brief, and *Mr. Smith* orally), for defendant Keith Lee.

*Ransmeier & Spellman, P.C.*, of Concord (*Charles P. Bauer & a.* on the brief, and *Mr. Bauer* orally), for defendants Town of Hooksett and Owen Gaskell.

*Wiggin & Nourie, P.A.*, of Manchester (*Gordon A. Rehnborg, Jr.* and *Mary Ann Dempsey* on the brief, and *Mr. Rehnborg* orally), for defendant Jeremiah Citro.

BRODERICK, C.J. This interlocutory appeal, *see* SUP. CT. R. 8, was brought by direct defendants, Town of Hooksett (Town), Owen Gaskell and Keith Lee, and third-party defendant Jeremiah Citro, from two rulings of the Superior Court (*Conboy*, J.). The first denied the direct defendants' motion for summary judgment seeking immunity from the negligence claim brought by the plaintiff, Sarah Everitt, and the second denied Citro's motion to dismiss the third-party claims against him. We affirm in part, reverse in part and remand.

I

The following facts are taken from the interlocutory appeal statement, unless otherwise noted. *See Guglielmo v. Worldcom*, 148 N.H. 309, 311 (2002). Citro was employed at the General Electric (GE) facility in Hooksett. On Saturday morning, November 1, 2003, he arrived at work, and his supervisor reminded him that on the day before, he had been instructed not to return to work until Monday. When Citro failed to leave, GE security contacted the Hooksett Police Department. Lee, a Hooksett police officer, arrived at about 10:45 a.m., but Citro had already left. Officer Lee was familiar with Citro from a prior encounter and went to his home to speak with him. Citro admitted that he was not supposed to be at the GE facility and agreed not to return there until the following Monday. Around 12:45 p.m. that day, however, Citro returned to GE. Hooksett Police were again contacted, and Officer Lee responded to the call. When he arrived, he noticed Citro sitting in his vehicle outside of the company gate. Citro told the officer that he was supposed to meet with the company nurse. During this conversation, Lieutenant Gaskell, also from the Hooksett Police Department, arrived. He observed that Citro had difficulty understanding the situation. As a result, the police conducted field sobriety tests and determined that Citro should be released. At about 3:00 p.m., Citro was involved in a motor vehicle accident with the van in which Everitt was a passenger, allegedly causing her significant injuries.

Everitt and Citro settled prior to suit for the full amount of Citro's automobile liability insurance limits.

Everitt then sued GE, a GE supervisor, the Town of Hooksett, Lieutenant Gaskell and Officer Lee. She later added as defendants the security company for GE and one of its employees. Everitt asserts that, because of Citro's unusual behavior, each defendant owed her a duty of care to prevent Citro from operating his motor vehicle on the day of the accident. With respect to the Town and the police officers, Everitt also alleges that they had knowledge of or access to information about Citro's prior motor vehicle accidents. For example, she asserts that two years before her accident, Citro hit a car in a parking lot while operating his automobile and that the Hooksett police took him into protective custody because of his disoriented state.

Officer Lee moved for summary judgment, which the Town and Lieutenant Gaskell joined, arguing, *inter alia,* that the doctrines of discretionary function immunity and qualified immunity precluded any liability for the decision not to detain Citro. The trial court denied the motion. Lee then brought a contribution action against Citro for his role in the accident, and defendants Town and Lieutenant Gaskell filed a claim against Citro, contending that he was an indispensable party who should be joined as a third-party defendant. Citro moved to dismiss these claims, arguing that under RSA 507:7-h (1997), no contribution action could be filed against him because he had entered into a valid settlement agreement with Everitt. He also contended that common law did not support including him in the litigation as an indispensable party, and that *Nilsson v. Bierman,* 150 N.H. 393 (2003), did not permit the joinder of a settling party. The trial court denied the motion and subsequently certified five questions for interlocutory appeal. We accepted three, none of which pertains to defendants GE, the GE supervisor, GE's security company or its employee.

## II

The first two questions relate to whether the trial court properly denied Citro's motion to dismiss him as a participating party in the litigation. They inquire:

Does 507:7-h, Effect of Release or Covenant Not to Sue, preclude a settling tortfeasor from being brought into litigation under a claim of contribution when there is no allegation that the settlement was not made in good faith?

Does *Nilsson v. Bierman,* 150 N.H. 393 (2003) allow a defendant to bring a settling tortfeasor into the litigation as a party, as

opposed to simply allowing them to be named on the jury verdict form, thereby requiring them to participate in the litigation itself and incur the costs of litigation despite obtaining a full release from liability?

Because defendant Lee now concedes that his contribution claim is barred by RSA 507:7-h, we need not address the first question. Thus, we only consider whether under *Nilsson*, a settling tortfeasor can be compelled to join litigation as a participating party. This inquiry constitutes a question of law, which we review *de novo*. *See K & B Rock Crushing v. Town of Auburn*, 153 N.H. 566, 568 (2006).

The legislature has enacted a "comprehensive statutory framework for apportionment of liability and contribution" in tort actions, designing several provisions of RSA chapter 507 to work in concert to create "a unified and comprehensive approach to comparative fault, apportionment of damages, and contribution." *Nilsson*, 150 N.H. at 395 (quotation omitted). In *Nilsson*, we were asked to decide whether the trial court properly instructed the jury to assess the percentage of fault attributable to a joint tortfeasor who settled before trial and to a non-settling party in accordance with RSA 507:7-e. *Id.* That statutory provision states in pertinent part:

In all actions, the court shall:

(a) Instruct the jury to determine, or if there is no jury shall find, the amount of damages to be awarded to each claimant and against each defendant in accordance with the proportionate fault of each of the parties; and

(b) Enter judgment against each party liable on the basis of the rules of joint and several liability, except that if any party shall be less than 50 percent at fault, then that party's liability shall be several and not joint and he shall be liable only for the damages attributable to him.

RSA 507:7-e, I(a), (b) (1997). We held that for the purposes of apportionment under RSA 507:7-e, I(b), the term "party" refers to "parties to an action, including settling parties," and affirmed the jury verdict that apportioned ninety-nine percent of the fault to the settling defendant and one percent to the non-settling defendant. *Nilsson*, 150 N.H. at 396 (ellipsis and quotations omitted).

In *DeBenedetto v. CLD Consulting Engineers*, 153 N.H. 793 (2006), a decision issued after this interlocutory appeal was filed, we again reviewed the scope of the term "party" in the apportionment statute, RSA 507:7-e.

We examined whether the trial court erred by instructing the jury to consider the apportionment of fault against "non-parties," a settling tortfeasor and a tortfeasor who was immune from liability. *DeBenedetto*, 153 N.H. at 797. Following *Nilsson*, we upheld the trial court's instruction noting that "for apportionment purposes under RSA 507:7-e, the word 'party' refers not only to parties to an action, including settling parties," but incorporates "all parties contributing to the occurrence giving rise to an action, including those immune from liability or otherwise [never sued.]" *Id.* at 804 (quotations and ellipsis omitted).

 Permitting juries to allocate fault on the verdict form among current parties, former parties who have settled, tortfeasors who settled before suit and immune tortfeasors does not mean that a settling tortfeasor (whether that tortfeasor settled with the plaintiff before or after suit was filed) may be joined in the litigation as an active litigant. In *Nilsson*, the settling tortfeasor was not an active litigant at trial. *Nilsson*, 150 N.H. at 396. The trial court simply instructed the jury about apportioning fault and, in its special verdict questions, asked the jury to assess the percentage of fault, if any, that was attributable to the defendant and the settling non-litigant tortfeasor. *Id.* at 394. We note that the jury returned a verdict assessing ninety-nine percent of fault to the settling tortfeasor who was not an active litigant. *Id.*

 Further, in *DeBenedetto*, we anticipated that jurors would apportion fault among joint tortfeasors, including those "otherwise not before the court." *DeBenedetto*, 153 N.H. at 804. Indeed, we noted that a defendant "may not easily shift fault under RSA 507:7-e; allegations of a *non-litigant* tortfeasor's fault must be supported by adequate evidence before a jury or court may consider it for fault apportionment purposes." *Id.* (emphasis added). Thus, we anticipated that the jury or the court would need to apportion fault among joint tortfeasors, even when some tortfeasors were not active litigants at trial, and we expected that the burden of establishing fault on the part of "non-litigant" tortfeasors would be borne by the litigant defendants. *Id.* Requiring a settling tortfeasor to participate actively in litigation, regardless of whether the defense cost is borne by an insurer, is not contemplated or permitted by *Nilsson* or *DeBenedetto*. Therefore, we conclude that a defendant is not permitted under *Nilsson* or *DeBenedetto* to bring a settling tortfeasor into the case as an active litigant, requiring him to participate in and incur the cost of the litigation itself. Accordingly, we hold that the trial court erred in denying Citro's motion to dismiss him as an active litigant in the case.

We decline to address arguments raised by the defendants that were not preserved for our review because they exceed the scope of the

interlocutory question presented. The defendants Town and Lieutenant Gaskell argue that the trial court properly exercised its discretion to retain Citro as a third-party defendant pursuant to RSA 514:10 (2007), Superior Court Rule 27 and our common law practice regarding necessary and indispensable parties. Defendant Lee joined in their argument, identifying Citro as a necessary and indispensable party. The interlocutory appeal question, however, is limited to inquiring whether *Nilsson* permits the defendants to join a settling tortfeasor as a party to the litigation. Thus, we decline to address the defendants' additional arguments. Further, we do not address the contention made by defendants Town and Gaskell that joinder of Citro comports with their rights to equal protection and due process under our State Constitution. This argument is also beyond the scope of the interlocutory appeal question, was asserted in a mere passing manner without further development, *see Franklin Lodge of Elks v. Marcoux*, 149 N.H. 581, 592 (2003), and was not raised below.

### III

We now turn to the third question posed in the defendants' interlocutory appeal:

> Were Officer Lee, Lt. Gaskell and/or the Town of Hooksett entitled to summary judgment because the decision not to detain Mr. Citro was a discretionary decision entitled to immunity under the doctrines of discretionary function immunity and/or qualified immunity?

This question incorporates two separate immunity inquiries: (1) whether the discretionary function immunity exception to municipal liability protects the individual police officers and/or the Town; and (2) whether qualified immunity affords similar protection. At the outset, we note that while Everitt asserts a direct claim against the Town for failing to provide proper training and discipline for its police officers, this claim was not included in the interlocutory appeal. Thus, our analysis regarding the defendants' possible immunity reaches only Everitt's claim of negligence premised upon the officers' decision not to detain Citro.

In denying the defendants' motion for summary judgment, the trial court ruled that it could not "find, under all the circumstances, that the Hooksett defendants are entitled[,] as a matter of law[,] to municipal immunity." It offered no other analysis or reasoning and did not separately address qualified immunity. When reviewing the denial of a motion for summary judgment, "we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party." *Porter v. City of Manchester*, 155

N.H. 149, 153 (2007). If "no genuine issue of material fact existed, and the moving party was entitled to judgment as a matter of law, then summary judgment should have been granted." *Id.* (quotation omitted); *see* RSA 491:8-a, III (1997). We review the trial court's application of the law to the facts *de novo. Belanger v. MMG Ins. Co.*, 153 N.H. 584, 586 (2006).

A

Various concepts of immunity exist under both common law and statutory law to protect governmental entities and public officials from liability for injury allegedly caused by official conduct. Sovereign and municipal immunity are distinct doctrines, both designed to protect particular government entities and both rooted in the common law at their inception. *Tilton v. Dougherty*, 126 N.H. 294, 298 (1985) (sovereign immunity); *Merrill v. Manchester*, 114 N.H. 722, 727 (1974) (municipal immunity). Sovereign immunity protects the State itself "from suit in its own courts without its consent," and shields it "from liability for torts committed by its officers and employees." *Tilton*, 126 N.H. at 297. In 1978, the legislature adopted the doctrine of sovereign immunity by statute, RSA 99-D:1 (2001), and has waived immunity for certain circumscribed acts, *see, e.g.*, RSA 507-B:2 (1997) (governmental unit may be held liable for certain damages arising out of government's operation, *inter alia*, of motor vehicles and premises). The doctrine of municipal immunity has historically protected local governments from tort liability. *Merrill*, 114 N.H. at 724. More than three decades ago, however, this court abrogated the common law doctrine of municipal immunity with limited exception. *Id.* at 729. Consequently, municipalities are subject in most instances to the same rules of liability as private corporations. *Id.* at 730.

With respect to personal liability for public officials and employees, the doctrines of qualified immunity and official immunity provide immunity for wrongful acts committed within the scope of their government employment. *Richardson v. Chevrefils*, 131 N.H. 227, 232 (1988); *Tilton*, 126 N.H. at 299. The doctrines are distinct, however, in that the former shields against lawsuits alleging constitutional violations, such as claims brought under 42 U.S.C. § 1983 (2000), whereas the latter shields against lawsuits alleging common law torts, such as negligence. *Compare Richardson*, 131 N.H. at 232, *with Tilton*, 126 N.H. at 299; *see also Mulligan v. Rioux*, 643 A.2d 1226, 1234 (Conn. 1994) (standard for qualified immunity that protects public officials from constitutional claims under 42 U.S.C. § 1983 is distinct from that for official immunity against common law claims). When it adopted sovereign immunity as the law of this state in 1978, the legislature also adopted official immunity for state

and state agency officers, trustees, officials and employees. RSA 99-D:1. This provision states in part that:

> The doctrine of sovereign immunity of the state, and by the extension of that doctrine, the official immunity of officers, trustees, officials, or employees of the state or any agency thereof acting within the scope of official duty and not in a wanton or reckless manner, except as otherwise expressly provided by statute, is hereby adopted as the law of the state.

RSA 99-D:1. It further provides that:

> The immunity of the state's officers, trustees, officials, and employees as set forth herein shall be applicable to all claims and civil actions, which claims or actions arise against such officers, trustees, officials, and employees in their personal capacity or official capacity, or both such capacities, from acts or omissions within the scope of their official duty while in the course of their employment for the state and not in a wanton or reckless manner.

*Id.* While the legislature also has adopted isolated provisions affording immunity to certain municipal officials, it has not enacted a provision corollary to RSA 99-D:1 extending official immunity to all municipal officers, trustees, officials and employees. *See, e.g.,* RSA 31:104 (2000) (certain municipal officials, such as selectmen, school board members, mayors and city managers, cannot be held liable for certain acts or decisions made "in good faith and within the scope of [their] authority"). Thus, other than those instances in which the legislature has spoken, the scope of official immunity for municipal employees sued in their individual capacities remains a common law question.

B

We turn now to consider the first part of the immunity inquiry before us, that is, whether discretionary function immunity identified in *Merrill* precludes liability against the Town for the decision of Lieutenant Gaskell and Officer Lee not to detain Citro. We have recognized that "certain essential, fundamental activities of government must remain immune from tort liability so that our government can govern," *Hacking v. Town of Belmont,* 143 N.H. 546, 549 (1999) (quotations and brackets omitted), and thus we preserved the discretionary function immunity exception primarily "to limit judicial interference with legislative and executive decision-making," *Schoff v. City of Somersworth,* 137 N.H. 583, 590 (1993). "To accept a jury's verdict as to the reasonableness and safety of a plan of

governmental services and prefer it over the judgment of the governmental body which originally considered and passed on the matter would be to obstruct normal governmental operations." *Gardner v. City of Concord,* 137 N.H. 253, 256 (1993). To that end, we defined the exception to provide immunity protection only for

> acts and omissions constituting (a) the exercise of a legislative or judicial function, and (b) the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion.

*Merrill,* 114 N.H. at 729 (discretionary function immunity exception).

█ In assessing whether the discretionary function immunity exception applies in any given case, we "distinguish between planning or discretionary functions and functions that are purely ministerial." *Hacking,* 143 N.H. at 549 (quotation omitted); *see Gardner,* 137 N.H. at 257. "We have refused to adopt a bright line rule to determine whether conduct constitutes discretionary planning or merely the ministerial implementation of a plan." *Hacking,* 143 N.H. at 549-50. Rather, recognizing that the distinction is "sometimes blurred," *Gardner,* 137 N.H. at 257, we adopted the following test to discriminate between the different functions:

> When the particular conduct which caused the injury is one characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning, governmental entities should remain immune from liability.

*Id.* It is not simply the exercise of a high degree of discretion and judgment that distinguishes immune acts or omissions from those that are not; the discretion or judgment must attach to decisions requiring consideration of public policy or planning to be protected. *See Mahan v. N. H. Dep't of Admin. Services,* 141 N.H. 747, 750 (1997). In particular, we distinguish between "policy decisions involving the consideration of competing economic, social, and political factors" and "operational or ministerial decisions required to implement the policy decisions." *Id.* Immunity extends only to decisions, acts and omissions for which attaching liability would permit judicial second-guessing of the governing functions of another branch of government. *See id.* at 749-50.

We have had numerous occasions to address the scope of the discretionary function immunity exception. In so doing, we have held that

immunity exists for: a planning board's approval of a subdivision plan without adequate drainage, *Hurley v. Hudson*, 112 N.H. 365, 369 (1972); a town selectmen's decision not to lay out certain roads, *Rockhouse Mt. Property Owners Assoc. v. Town of Conway*, 127 N.H. 593, 600 (1986); traffic control and parking regulations, *Sorenson v. City of Manchester*, 136 N.H. 692, 694 (1993); setting of road maintenance standards and construction of a sidewalk when based upon a city's faulty plan or design, *Gardner*, 137 N.H. at 258, 259; traffic control and management of roadway safety, *Bergeron v. City of Manchester*, 140 N.H. 417, 422, 424 (1995); a decision whether to enact maintenance and inspection regulations, *Mahan*, 141 N.H. at 751; and the training and supervision of coaches and referees at a school basketball game, *Hacking*, 143 N.H. at 550.

Yet, we have denied immunity to municipalities for failing to carry out an established plan to inspect roadway signage and railings, *Schoff*, 137 N.H. at 590, as well as for decisions by the referees and coaches during a school basketball game, *Hacking*, 143 N.H. at 551-52. We also have analyzed discretionary function immunity as it applies to the State's limited waiver of sovereign immunity. *See, e.g., DiFruscia v. N.H. Dept. of Pub. Works & Highways*, 136 N.H. 202, 205 (1992) (although decision whether or where to place guardrail on a State highway falls within discretionary immunity, State not immune for failure of State worker to install specific guardrail); *Bergeron*, 140 N.H. at 422 (State immune from liability for decision whether to install flashing beacon at intersection). After examining "the broad spectrum of official actions that can be called discretionary, to determine the point at which the exercise of discretion is no longer characterized by a choice of policy and becomes simply a choice of a means to implement policy," *Mahan*, 141 N.H. at 750 (quotation and brackets omitted), we conclude that the decision of Lieutenant Gaskell and Officer Lee not to detain Citro does not constitute the type of discretionary function protected under the *Merrill* immunity exception.

The Town seeks immunity for discretionary functions involving acts or omissions constituting "the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Merrill*, 114 N.H. at 729. According to the Town, the scope of decisions protected by the discretionary function immunity exception "is not limited to planning decisions by a municipal governing body," but extends protection to the exercise of executive functions. The Town argues that under RSA 135-C:28, III and RSA 172-B:3, police authority to take a person into protective custody requires officers to evaluate the mental condition of a person, the cause of the condition, likely future conduct and harm, and alternative approaches to assisting the person and protecting the public.

These decisions, according to the Town, "require[] the deliberation and judgment characteristic of discretionary conduct, and fundamental judgments about how to deal with members of the public as a representative of government."

RSA 135-C:28, III (2005) provides in pertinent part that:

> When a peace officer observes a person engaging in behavior which gives the peace officer reasonable suspicion to believe that the person may be suffering from a mental illness and probable cause to believe that unless the person is placed in protective custody the person poses an immediate danger of bodily injury to himself or others, the police officer may place the person in protective custody.

RSA 172-B:3 (2002), states, in pertinent part, that:

> I. When a peace officer encounters a person who, in the judgment of the officer, is intoxicated as defined in RSA 172-B:1, X, the officer may take such person into protective custody and shall take whichever of the following actions is, in the judgment of the officer, the most appropriate to ensure the safety and welfare of the public, the individual, or both.
>
> . . . .
>
> II. When a peace officer encounters a person who, in the judgment of the officer, is incapacitated as defined in RSA 172-B:1, IX, the officer may take such person into protective custody and shall take whichever of the following actions is, in the judgment of the officer, the most appropriate to ensure the safety and welfare of the public, the individual, or both.

■ Certainly, under these statutes, the process of reaching a decision about whether to detain Citro required Lieutenant Gaskell and Officer Lee to evaluate carefully Citro's conduct and attendant circumstances, and to use their trained judgment, experience and discretion. Their decision was not menial, rote or automatic. The exercise of discretion, even to a significant degree, however, is not the sole factor for determining whether government conduct constitutes a discretionary function. To be protected, the official discretion must constitute a choice of policy or planning, involving the consideration of competing economic, social, and political factors. The officers' discretion in this case did not involve legislative or executive policy-making or government planning. *Cf. Hacking*, 143 N.H. at 552 (decisions of referees and coaches during basketball game, while perhaps involving some discretionary judgment, were not decisions

concerning municipal planning and public policy); *Peavler v. Monroe Cty. Bd. of Com'rs*, 528 N.E.2d 40, 45 (Ind. 1988) (question not simply whether judgment was exercised, but whether judgment required consideration of policy). Simply put, their decision did not involve municipal governing. Therefore, subjecting the Town to liability for the officers' decision is not tantamount to judicial interference with legislative or executive decision-making which would otherwise compromise our system of separation of powers. *See Schoff*, 137 N.H. at 590. Accordingly, the Town, as a matter of law, cannot rely upon discretionary function immunity to protect it from liability for the alleged negligence of Lieutenant Gaskell and Officer Lee.

We decline the Town's invitation to expand the scope of discretionary function immunity. As the last remnant of common law municipal immunity, the exception was tailored to satisfy the underlying policy of preserving and respecting our system of separation of powers. We are not convinced that this case requires an extension or modification of the parameters already recognized.

## C

The second component of the immunity question before us requires us to consider whether the doctrine of qualified immunity shields the individual police officers from personal liability, as well as vicariously protecting the Town. In reality, Lieutenant Gaskell and Officer Lee seek official immunity, not qualified immunity, because Everitt seeks recovery based upon a common law tort claim and not upon an alleged constitutional violation. Further, in the pleadings below and the briefs before us, Lieutenant Gaskell and Officer Lee argue for application of official immunity, as demonstrated by the legal authority cited for their position, albeit they at times interchange the term qualified immunity.

■ Official immunity protects individual government officials or employees from personal liability for discretionary actions taken by them within the course of their employment or official duties. *See Tilton*, 126 N.H. at 298-99; *Sletten v. Ramsey County*, 675 N.W.2d 291, 300 (Minn. 2004); *Cameron v. Lang*, 549 S.E.2d 341, 344 (Ga. 2001). We previously have applied official immunity to protect various government employees from personal liability. For example, any public officer performing judicial duties is immune from suit for harm caused by a mistake made in the performance of official duties, provided the officer had jurisdiction over the person and subject matter. *See Sargent v. Little*, 72 N.H. 555, 556-57 (1904) (immunity for members of state board of license commissioners for granting state licenses); *Sweeney v. Young*, 82 N.H. 159, 165-66 (1925) (immunity for members of school board for quasi-judicial decision

dismissing student). Prosecutors also enjoy immunity when performing advocacy functions; that is, functions which are intimately related to initiating and pursuing judicial proceedings against a person. *Belcher v. Paine*, 136 N.H. 137, 146 (1992). The legislature has provided official immunity to certain municipal employees performing particular job functions on the government's behalf. *See, e.g.*, RSA 31:104 (certain municipal officials, such as selectmen, school board members, mayors and city managers, cannot be held liable for certain acts or decisions made "in good faith and within the scope of [their] authority"). Further, it adopted official immunity as the law of the state concerning all state officers, trustees, officials and employees. RSA 99-D:1. Whether municipal police officers are entitled to the protection of official immunity remains a common law question, a matter of first impression before us today.

██ "The goal of official immunity is to protect public officials from the fear of personal liability, which might deter independent action and impair effective performance of their duties." *Sletten*, 675 N.W.2d at 299; *see also Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001); *Hudson v. Town of East Montpelier*, 638 A.2d 561, 564 (Vt. 1993); RESTATEMENT (SECOND) OF TORTS § 895D comment *b* at 412 (1979). A genuine need exists to "preserv[e] independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits." RESTATEMENT, *supra* comment *b* at 412. Further, those individuals charged with exercising discretion and judgment when conducting the affairs of government stand in a unique position:

> The complex process of the administration of government requires that officers and employees be charged with the duty of making decisions, either of law or of fact, and of acting in accordance with their determinations.

*Id.* It would be

> manifest[ly] unfair[] [to] plac[e] any [public official] in a position in which he is required to exercise his judgment and at the same time is held responsible according to the judgment of others, who may have no experience in the area and may be much less qualified than he to pass judgment in a discerning fashion or who may now be acting largely on the basis of hindsight.

*Id.*; *see also Cameron*, 549 S.E.2d at 344 (immunity meant to preserve public employee's independence of action without fear of lawsuits and to prevent review of his judgment in hindsight). The United States Supreme Court has pointed out that the consequences of personal liability

> are not limited to liability for money damages; they also include the general costs of subjecting officials to the risks of trial— distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.

*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (quotation omitted) (discussing qualified immunity). In sum, official immunity is designed to encourage and safeguard the ability of public officials to act properly in the exercise of the discretion required by their official duties to the benefit of the public on whose behalf the officials act.

Whether, and to what extent, official immunity should be granted to a particular public official is largely a policy question, *see Tilton*, 126 N.H. at 299, and depends upon the nature of the claim against the official and the particular government activity that is alleged to have given rise to the claim, *see Sletten*, 675 N.W.2d at 304; RESTATEMENT, *supra* comment *f* at 415-16. It is necessary to examine "the kind of discretion which is exercised and whether or not the challenged government activities require something more than the performance of ministerial duties." *Sletten*, 675 N.W.2d at 304. Ultimately, numerous factors must be examined and weighed, and we identify but a few: (1) the nature and importance of the function that the officer is performing; (2) the importance that the duty be performed to the best judgment of the officer, unhampered by extraneous matters; (3) whether the function is performed by private individuals for which they could be held liable in tort or it is one performed solely by the government; (4) the extent of the responsibility involved and the extent to which the imposition of liability would impair the free exercise of discretion by the officer; (5) the likelihood that the official will be subjected to frequent accusations of wrongful motives; (6) the extent to which the threat of vexatious lawsuits will impact the exercise of discretion; (7) whether the official would be indemnified by the government or whether any damage award would be covered by insurance; (8) the likelihood that damage will result to members of the public in the absence of immunity; (9) the nature of the harm borne by the injured party should immunity attach; and (10) the availability of alternative remedies to the injured party. *See generally* RESTATEMENT, *supra* comment *f* at 416-17. A commentator aptly stated the nature of the comparison and evaluation of these competing factors:

> Some official conduct is more vulnerable to attack than other conduct. Some official conduct especially needs a free range of choice that is not hampered by concerns over potential personal liability. Other official conduct is neither especially vulnerable to

complaint nor in need of especially unhampered decision-making. One who repairs the street can do a good job without provoking a citizen suit; the prosecuting attorney cannot do a good job without provoking anger and, sooner or later, a citizen suit. Good operation of the prosecutor's office does adversely affect people (usually criminals, but, unavoidably, others as well); good operation of the street repair department does not harm people, but on the contrary makes their travel safer. Both kinds of work are socially desirable, but one kind, since it is intended to adversely affect others and does so, is more likely to generate claims than the other. The range of free choice needed in the two kinds of work is also quite different. The importance of the officer's freedom of decision and the likelihood of unjust suit for honest decision-making are factors to be considered in deciding whether official conduct is "discretionary" and immune or "ministerial" and unprotected.

W.P. KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 132, at 1065 (5th ed. 1984). Within this framework, we examine whether public policy demands the extension of official immunity to municipal police officers.

Police officers are trusted with one of the most basic and necessary functions of civilized society, securing and preserving public safety. This essential and inherently governmental task is not shared with the private sector. Police officers are regularly called upon to utilize judgment and discretion in the performance of their duties. They must make decisions and take actions which have serious consequences and repercussions to the individuals immediately involved, to the public at large and to themselves. On any given day, they are required to employ their training, experience, measured judgment and prudence in a variety of volatile situations, such as investigatory stops, investigations of crime, arrests and high speed pursuits, to name a few. Even routine traffic stops can be unpredictable and can escalate into dangerous, and sometimes deadly, affairs.

Further, law enforcement by its nature is susceptible to provoking the hostilities and hindsight second-guessing by those directly interacting with police as well as by the citizenry at large. Police officers, as frontline agents for the executive branch, are particularly vulnerable to lawsuits, whether the underlying police conduct or decision was errant or not. Unbridled exposure to personal liability and hindsight review of their decisions would undoubtedly compromise effective law enforcement and unfairly expose officers to personal liability for performing inherently governmental tasks. The public safety entrusted to police officers demands

that they remain diligent in their duties and independent in their judgments, without fear of personal liability when someone is injured and claims an officer's decision or conduct was to blame. The public simply cannot afford for those individuals charged with securing and preserving community safety to have their judgment shaded out of fear of subsequent lawsuits or to have their energies otherwise deflected by litigation, at times a lengthy and cumbersome process.

Certainly, it is incontrovertible that immunity can be fundamentally unfair to our citizens who are injured by erroneous police decisions. When abrogating municipal immunity in *Merrill*, we emphasized that compelling a citizen to bear his loss himself when injured by the negligence of municipal employees "offends the basic principles of equality of burdens and of elementary justice." *Merrill*, 114 N.H. at 724. We further recognized that leaving an injured citizen exposed without recourse "is foreign to the spirit of our constitutional guarantee that every subject is entitled to a legal remedy for injuries he may receive in his person or property." *Id.* at 725; *see* N.H. CONST. pt. I, art. 14. We are, however, at a crossroad of competing policies, and we must formulate a necessary compromise.

Numerous jurisdictions have adopted some version of official immunity to protect police officers from personal liability, either by common law or by legislation. *See, e.g., Borders v. City of Huntsville*, 875 So. 2d 1168, 1178 (Ala. 2003) (statutory immunity); *Samaniego v. City of Kodiak*, 2 P.3d 78, 83 (Alaska 2000) (common law immunity); *Mulligan*, 643 A.2d at 1234 (common law immunity); *Cameron*, 549 S.E.2d at 344 (common law immunity); *Dokman*, 637 N.W.2d at 296 (common law immunity); *Clea v. City of Baltimore*, 541 A.2d 1303, 1308 (Md. 1988) (common law immunity); *Brumfield v. Lowe*, 744 So. 2d 383, 388 (Miss. Ct. App. 1999) (common law immunity); *Prior v. Pruett*, 550 S.E.2d 166, 174 (N.C. Ct. App. 2001) (common law immunity); *Alston v. City of Camden*, 773 A.2d 693, 697, 703-04 (N.J. 2001) (statutory immunity); *Clark v. University of Houston*, 60 S.W.3d 206, 208 (Tex. Ct. App. 2001) (common law immunity); *Long v. L'Esperance*, 701 A.2d 1048, 1052 (Vt. 1997) (common law immunity). When affording official immunity to town selectmen, we emphasized realities that are equally applicable here:

> [I]t is impossible to know whether [a] claim [against an official] is well founded until the case has been tried, and [thus] to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the

public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

*Voelbel v. Town of Bridgewater*, 144 N.H. 599, 601 (1999) (quotation omitted).

█ Today, we decide that encouraging independent police judgment for the protection and welfare of the citizenry at large must prevail over ensuring common law civil recourse for individuals who may be injured by errant police decisions. We adopt parameters for official immunity, as informed by our case law, the law in foreign jurisdictions as well as the scope of official immunity identified by the legislature in RSA 99-D:1. Accordingly, we hold that municipal police officers are immune from personal liability for decisions, acts or omissions that are: (1) made within the scope of their official duties while in the course of their employment; (2) discretionary, rather than ministerial; and (3) not made in a wanton or reckless manner. We caution against a formulaic approach to discerning discretionary and ministerial decisions, acts or omissions. In the context of immunity, these terms are not subject to a dictionary definition, nor can they be reduced to a set of specific rules. RESTATEMENT, *supra* comment *d* at 413; *Hudson*, 638 A.2d at 564. The prescription we provide today for discerning the dividing point between discretionary and ministerial decisions, acts or omissions is intended not to provide exacting strictures, but rather to furnish guiding criteria to enable courts to render legal conclusions that accomplish the policies underlying the grant of official immunity. Above all, the distinction must serve the purposes underlying official immunity. *See Hudson*, 638 A.2d at 564.

█ A discretionary decision, act or omission involves the exercise of personal deliberation and individual professional judgment that necessarily reflects the facts of the situation and the professional goal. *Sletten*, 675 N.W.2d at 306; *Clark*, 60 S.W.3d at 208. Such decisions include those for which there are no hard and fast rules as to the course of conduct

that one must or must not take and those acts requiring the exercise of judgment and choice and involving what is just and proper under the circumstances. *Borders*, 875 So. 2d at 1178. An official's decision, act or omission is ministerial when it is absolute, certain and imperative, involving merely execution of a specific duty arising from fixed and designated facts. *Sletten*, 675 N.W.2d at 306; *Dokman*, 637 N.W.2d at 296; *Clark*, 60 S.W.3d at 208 (ministerial actions are those which require obedience to orders or performance of a duty which leave no choice for the public official). "Ministerial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion," *Mulligan*, 643 A.2d at 1233 (quotations and brackets omitted), and includes those decisions, acts or omissions "imposed by law with performance required at a time and in a manner or upon conditions which are specifically designated, the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion," *Brumfield*, 744 So. 2d at 388 (quotation and brackets omitted); *see also* RESTATEMENT, *supra* comment *h* at 418 (acts are ministerial when official administers law "with little choice as to when, where, how or under what circumstances their acts are to be done").

We note that the criteria adopted today for characterizing a decision, act or omission as "discretionary" for purposes of official immunity is in accord with *Tilton*. In *Tilton*, we refused to apply official immunity to individual state employees because the alleged negligent acts and omissions did not "call for deliberation, discretion, judgment or policy choice," and otherwise constituted "mere inaction or inattention" not protected by official immunity. *Tilton*, 126 N.H. at 300. Yet, we left open the question of "whether the discretionary character of official action that may support an immunity claim must involve the exercise of a governmental function." *Id.* (citing discretionary function immunity exception under *Merrill*). In other words, we did not decide whether official immunity could extend to discretionary decisions, acts or omissions that do not involve governmental policy-making or planning.

"Discretionary" necessarily has a broader meaning in the context of official immunity than that in the context of the discretionary function immunity exception for municipalities under *Merrill* given the differing policies underlying the two. *See Nusbaum v. Blue Earth County*, 422 N.W.2d 713, 718 n.4 (Minn. 1988). The discretionary function immunity exception protects municipalities from judicial intrusion into the province of the executive or legislative branch by supervising its policy and planning decisions through tort law. Thus, the discretionary functions that fall within the protection of the exception are limited to discretionary decisions involving municipal policy-making or planning. By contrast, official

immunity is premised upon removing the fear of personal liability for public officials who are required to exercise discretion in the performance of their official duties so that they are free to exercise independent judgment and effectively perform the responsibilities of their government employment. Public officials may be required to exercise discretion in the operation or implementation of a government policy or plan, such that subjecting the decision to unbridled tort liability would compromise the official's ability to render independent judgment and effectively perform his job. Accordingly, the scope of the discretionary decisions, acts or omissions protected by official immunity must be broader than functions of governing, with official immunity protecting the kind of discretion exercised at the operational level rather than exclusively at the policy-making or planning level. *See Sletten*, 675 N.W.2d at 301-02; *Hudson*, 638 A.2d at 565 n.1.

Because today we have adopted, for the first time, official immunity for municipal police officers, and identified the standard for determining whether such immunity protects an officer's particular decision, act or omission, we remand this case to the trial court for it to determine whether official immunity applies in this case. We caution that the purpose of immunity is to operate as a bar to a lawsuit, rather than as a mere defense against liability, and is "effectively lost if a case is erroneously permitted to go to trial." *Sletten*, 675 N.W.2d at 300 (quotation omitted); *see also Richardson*, 131 N.H. at 231 (discussing qualified immunity for constitutional claims).

## IV

One final matter remains, determining whether the Town may enjoy vicarious immunity should the trial court determine that official immunity protects Lieutenant Gaskell and Officer Lee from personal liability for their allegedly negligent decision not to detain Citro. Official immunity, when available to individual public officials, generally may be vicariously extended to the government entity employing the individual, but it "is not an automatic grant." *Sletten*, 675 N.W.2d at 300; *see also* RESTATEMENT, *supra* comment *j* at 419-20. Vicarious immunity ought to apply when the very policies underlying the grant of official immunity to an individual public official would otherwise be effectively undermined. *See Sletten*, 675 N.W.2d at 300. In other words, vicarious immunity applies when exposing the municipality to liability would focus "stifling attention" upon the individual official's job performance and thereby deter effective performance of the discretionary duties at issue. *Id.*; *cf. Tilton*, 126 N.H. at 299 (indemnification of individual state officials does not protect independence in judgment and discretion because individuals still would

fear retribution from government that would have to pay the judgment). We note that the legislature is free to enact legislation that would otherwise afford relief to citizens harmed by the negligent conduct of municipal police officers. *See Cameron*, 549 S.E.2d at 347 (immunity for individual public employee does not protect government employer to the extent that employer has secured liability insurance). On remand, should the trial court determine that Lieutenant Gaskell and Officer Lee are entitled to official immunity, it must also determine whether the Town is protected by vicarious immunity under the standard adopted today.

In sum, we conclude that our holdings under *Nilsson* and *DeBenedetto* do not permit joinder of Citro, a tortfeasor who has fully settled Everitt's liability claim against him, as an active litigant in the case. Thus, we reverse the trial court's denial of Citro's motion to dismiss him as a necessary and indispensable party. Should the case go to trial, pursuant to RSA 507:7-e, I, the jury should apportion fault among all of the alleged tortfeasors, and the jury verdict form should identify Citro as a party for purposes of apportioning fault. We affirm the trial court's denial of the Town's motion for summary judgment, but hold as a matter of law that the Town is not entitled to immunity under discretionary function immunity. We remand for the trial court to determine whether Lieutenant Gaskell and Officer Lee are entitled to official immunity for their decision not to detain Citro, and whether the Town is entitled to vicarious immunity.

*Affirmed in part; reversed in part; and remanded.*

DALIANIS and DUGGAN, JJ., concurred.