NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2012-440


JAMES A. CONRAD

v.

NEW HAMPSHIRE DEPARTMENT OF SAFETY <u>&</u> <u>a</u>.

Argued:  November 7, 2013
Opinion Issued:  November 6, 2014


<u>Douglas, Leonard & Garvey, P.C.</u>, of Concord (<u>Charles G. Douglas, III</u> and <u>C. Kevin Leonard</u> on the brief, and <u>Mr. Douglas</u> orally), for the plaintiff.


<u>Michael A. Delaney</u>, attorney general (<u>Laura E. B. Lombardi</u>, assistant attorney general, on the brief and orally), for the defendants.


BASSETT, J.  The plaintiff, James A. Conrad, appeals an order of the Superior Court (<u>Smukler</u>, J.) granting the defendants' motion for a directed verdict on grounds that they were entitled to sovereign, official, and qualified immunity.  The plaintiff brought suit against both defendants, New Hampshire Department of Safety (NHDS) and New Hampshire State Trooper Lieutenant Mark Myrdek, for false imprisonment, and against Myrdek for a violation of his civil rights pursuant to 42 U.S.C. § 1983 (2012), seeking damages for events that occurred on November 28, 2007.  The defendants cross-appeal, raising evidentiary issues.  We affirm.

I. Facts

The following facts are supported by the record. On November 28, 2007, the plaintiff was a state trooper working as a detective in the Major Crimes Unit. He had been employed as a state trooper since 1993.

In September 2007, the plaintiff was experiencing marital problems. On September 22, after the plaintiff reported his wife missing, he failed to stop for police officers when speeding through the town of Meredith in his personal vehicle. Thereafter, he requested state police assistance, including the canine unit, to search for his wife after her car was located behind a school. The plaintiff's unit commander, Captain Russell Conte, received a telephone call at approximately three o'clock in the morning from the plaintiff's troop commander, informing him of these events.

The report of this incident was provided to the director of the state police, Colonel Frederick Booth, and to Myrdek, commander of the state police professional standards unit. The report included the following facts: that the plaintiff had his wife's car towed from the school parking lot; he returned to the parking lot to wait for her; and that, when she returned to the parking lot accompanied by another man, the plaintiff told him that he was "f-ing lucky to be breathing." On Monday September 24, Booth met with the plaintiff and cautioned him to "be scrupulously careful about not bringing his personal life into his work life."

In October, the plaintiff's wife filed for divorce. That same month, she called the state police, claiming that the plaintiff had locked himself in the bathroom with his service weapon. The plaintiff denied that the incident had occurred; nonetheless, he was placed on administrative leave. He was relieved of his service weapon and police cruiser, and referred to the Employee Assistance Program. The plaintiff returned to full duty in early November 2007, after a counselor determined that he was "currently not a danger to himself or others."

On November 8, following a family court hearing attended by the plaintiff and his estranged wife, the court issued a temporary divorce decree. Pursuant to that decree, "Each party [was] restrained and enjoined from entering the home or the place of employment of the other party, and from harassing, intimidating or threatening the other party or his/her relatives or other household members." The plaintiff testified that he was not aware of the restraining order prior to the incident on November 28, because his mail was still being sent to the marital home in Laconia and he was staying in Concord.

On November 26, Conte received a telephone call from the Laconia Police Department, informing him that the plaintiff's wife had requested additional patrols by her home after she and the plaintiff had argued over the telephone

the previous night. During that phone call, the plaintiff told his wife that he was "going to hell for what [he wanted] to do."

Later on November 26, the plaintiff visited Conte's office and told him he was thinking of resigning and "going . . . away." Conte described the plaintiff as being "disheveled," "emotional," and "angry about his wife." Given that the plaintiff was only eight months from full retirement, Conte encouraged him to seek the advice of an attorney before making a final decision. When asked by Conte about his "going to hell" statement, the plaintiff explained that it referred to him leaving his children, moving out of state, and withdrawing his retirement funds to split with his wife. Although Conte testified that he took the plaintiff's explanation at "face value," he also had "reservations." Accordingly, as soon as the plaintiff left his office, Conte went to speak with his superior to advise him of the conversation so that his superior could pass it on to Booth.

The next day, Conte received a telephone call from the plaintiff's wife, asking where the plaintiff was. She told Conte, among other things, that she thought the plaintiff had been in her residence the night before, and that he had erased messages on the answering machine and "moved some stuff around." Following this conversation, Conte spoke by telephone with the wife's attorney who confirmed that the temporary divorce decree included a provision prohibiting the plaintiff from entering his wife's residence.

Conte was "very concerned" and immediately discussed the matter with Major Susan Forey, the head of the Field Operations Bureau, and Myrdek. Based upon information communicated to Conte by the plaintiff's wife – including that the plaintiff may have been in her residence in violation of the temporary divorce decree, that she was concerned about the plaintiff's welfare, and that the plaintiff had allegedly commented to her that he knew where her attorney lived – Conte, Forey, and Myrdek decided to open an internal affairs investigation and to have Myrdek speak with the plaintiff the following day.

On November 28, the plaintiff was attending an off-site training session when he was contacted by NHDS staff and told to report to Myrdek's office at state police headquarters. The plaintiff arrived at Myrdek's office at approximately 2:05 p.m. Myrdek informed him that he was subject to an administrative interview and provided him with a "Garrity Warning" containing the allegations that were the subject of the investigation. See Garrity v. New Jersey, 385 U.S. 493 (1967); Appeal of Waterman, 154 N.H. 437, 442 (2006) (before any interview of a state trooper may take place a "Garrity Warning" must be given, "inform[ing] the accused that the purpose of questioning is to assist in determining whether to impose administrative discipline"). These allegations included "[t]he possible violation of a temporary court order regarding [the plaintiff's] pending divorce and comments [he] may have made to [his] wife regarding [his] actions and her attorney." The plaintiff responded that

3

the allegations were "bullshit" and that his wife "can't prove I was in the house, because I wasn't." The plaintiff was agitated. The plaintiff stated that he wanted union representation and Myrdek allowed him to leave to make such arrangements.

The plaintiff contacted a union representative, Trooper Christopher LaPorte, who in turn asked to speak to Myrdek. The plaintiff returned to Myrdek's office at approximately 2:30 p.m. and Myrdek spoke on the telephone with LaPorte. Myrdek explained that there had been an allegation that the plaintiff had violated a restraining order and made threats against his estranged wife, and that immediate action had to be taken. LaPorte indicated that he thought the issues were beyond his ability as a representative and suggested that the plaintiff seek the assistance of the union attorney, James Donchess. Myrdek agreed that it would be a good idea to have Donchess present for the interview if he could get there within a reasonable amount of time. The plaintiff left Myrdek's office again to continue to make arrangements for union representation. The plaintiff was still agitated.

Sometime between 2:45 and 3:00 p.m., as the plaintiff was returning to Myrdek's office to report on his efforts to contact Donchess, he met Myrdek in the hall. The plaintiff informed Myrdek that Donchess was not available and that the interview would need to be rescheduled to Thursday or Friday. Myrdek directed the plaintiff back to Myrdek's office and asked him to close the door. The plaintiff and Myrdek argued about whether the interview was going to occur that day, their voices rising. The plaintiff told Myrdek that he was not going to speak to him without Donchess present. Myrdek responded that the interview was going to be conducted that day, so the plaintiff would need to find other union representation. When Myrdek told the plaintiff he was not going to let him leave headquarters until the plaintiff spoke with him about the allegations, the plaintiff became enraged.

The plaintiff then told Myrdek he was quitting and he tried to hand him a resignation letter. Myrdek refused to accept it and told the plaintiff the colonel would not accept it either. The plaintiff responded, "Well, F you and F the colonel. I'm leaving, I quit." The plaintiff then opened up his jacket and said, "[H]ere's my gun and here's my badge, I quit." Myrdek put his arms up and said, "Jimmy, Jimmy, Jimmy, calm down. I don't want your gun and I don't want your badge." The plaintiff told Myrdek that he was leaving. Myrdek responded by telling him that he couldn't leave, and that he needed to calm down. Myrdek testified that the plaintiff appeared to be out of control and not making rational decisions.

When the plaintiff attempted to leave the office, Myrdek stepped between the plaintiff and the closed door, put his hand on the doorframe, and ordered the plaintiff to stay. The plaintiff reached under Myrdek's arm and opened the door. Because the door opened in, Myrdek stepped out of the way so the

plaintiff could open the door, but then stepped back into the doorway. Myrdek continued to urge the plaintiff to calm down and ordered him to sit down. The plaintiff said, "I f***ing quit . . . I'm all done. F*** you," and walked past Myrdek into a common area.

Myrdek followed the plaintiff into the common area and again stood in front of him, ordering him to go back in his office and sit down. Lieutenant Liebl, whose office was behind Myrdek's, was watching from his office doorway because he had heard loud arguing in Myrdek's office. The plaintiff asked why Myrdek was taking the wife's side, referred to her as a "c**t," said he was "all f***ing done" and walked past Myrdek. Liebl testified that because of the plaintiff's "demeanor, the words, the profanity, the crudeness," that "clearly [the plaintiff] was very, very agitated, very angry." As the plaintiff continued down the hallway toward an exit door, he punched the door with considerable force. Myrdek then grabbed the plaintiff in "a bear hug," and he and Liebl struggled with the plaintiff.

Forey, hearing "alarming raised voices," left her office to see what was happening and saw the plaintiff, Myrdek, and Liebl in a "scuffle." As the three officers continued to struggle, Forey put her hand on her taser. Because the plaintiff was so angry, Forey thought that the officers were not going to be able to overpower him and that she would have to "tase" him. The plaintiff slowly relaxed and Myrdek slowly released his hold on him and asked him to come back into the office and wait for the union representatives. When the plaintiff and Myrdek went back into Myrdek's office, Forey positioned officers outside the door for "everyone's safety," including the civilian personnel working in the building.

Inside the office, the officers removed the plaintiff's weapon and handed it out the door. The plaintiff remained there for approximately the next two hours. During that time, the plaintiff was very emotional, crying, and saying his career was over. He expressed hostility toward his wife, and he said that life was not worth living. The plaintiff said he was going to take Myrdek's gun, thereby forcing another officer to shoot him. At one point he threatened to jump out a window, and talked about committing suicide. He stated he wished he had been killed in Iraq. He called his wife on the telephone and yelled vulgarities.

When Booth returned to police headquarters at approximately 4:30 p.m., Forey met with him and an attorney from the department of safety and told them what had happened. Booth then met with Department of Safety Commissioner John Barthelmes, and, "[i]n order to give [the plaintiff] a fair judgment," the decision was made to have the Concord Police Department take custody of the plaintiff and handle any criminal charges that might result from the incident.

5

The Concord police arrived at headquarters at approximately 5:30 p.m. Forey met with them when they entered the building to apprise them of the gravity of the situation and warn them, for their own safety, not to let their guard down at the hospital. When the plaintiff was told he was under arrest, he "exploded," was "screaming and crying," and threatened one of the Concord police officers, saying that he was going to take the officer's gun and shoot the officer and then turn the gun on himself. Concord police took the plaintiff into custody and transported him by ambulance to Concord Hospital. The plaintiff was subsequently admitted to the New Hampshire Hospital.

The plaintiff brought suit against NHDS and Myrdek for false imprisonment and against Myrdek for a violation of 42 U.S.C. § 1983 (section 1983). Although the trial court reserved the section 1983 claim for its own determination, it held a nine-day jury trial in May 2012 on the plaintiff's false imprisonment claim. The defendants moved for a directed verdict at the close of the plaintiff's case. The defendants argued that the false imprisonment claim against NHDS and Myrdek was barred by sovereign and official immunity, and the section 1983 claim against Myrdek was barred by qualified immunity. The trial court took the motion under advisement. Following closing arguments and jury instructions, the trial court stated that, should the jury return a verdict for the plaintiff, it would rule on the immunity issues. The jury returned a verdict for the plaintiff, awarding $1.5 million in compensatory damages on the false imprisonment claim, attributing seventy percent of the fault to NHDS and thirty percent to Myrdek.

The trial court thereafter ruled on the defendants' motion for a directed verdict. In its order the court noted that "[t]he defendants' motion does not attack the plaintiff's ability to satisfy the elements of a false imprisonment claim; indeed, at this point they cannot do so because the jury has found that the plaintiff met his burden of proving the elements of false imprisonment." The trial court nonetheless concluded that NHDS was entitled to sovereign immunity, and that Myrdek was entitled to official immunity, on the false imprisonment claim.

Viewing the record in the light most favorable to the plaintiff, the court found that the NHDS officers, acting within the scope of their employment, "had a reasonable basis to believe that their conduct was lawful" because "[t]he officers knew that the plaintiff was having an extremely difficult time with the divorce," "[t]he plaintiff used highly inappropriate language throughout the interview process, most of which was directed toward his wife," and "the plaintiff became extremely upset and punched a door hard before he left the common area." The court also found that the NHDS officers "could have reasonably believed that the plaintiff violated a protective order" because Conte and Myrdek "received information from the Laconia police department and from Ms. Conrad that the plaintiff . . . [had] enter[ed] Ms. Conrad's home" and, further, that the officers "had information that the plaintiff told his wife he

6

would 'go to hell' for what he 'was about to do.'" As to the two-hour detention of the plaintiff at state police headquarters, the trial court found that the officers believed that they were justified in detaining the plaintiff based upon his behavior and statements, including his threats to commit "suicide by cop." The court also found that the officers acted reasonably in contacting their superiors and that because there was "no evidence that any participant failed to treat the matter with the appropriate priority," under the circumstances "the two-hour period to allow the officers to deliberate and come to a referral decision was not unreasonable." Accordingly, the trial court concluded that NHDS was entitled to sovereign immunity.

In addition, the court found that Myrdek was entitled to official immunity under RSA 99-D:1 (2013), which provides that state officials and employees are protected from "civil actions arising from acts committed within the scope of their official duty while in the course of their employment for the state and not in a wanton or reckless manner." RSA 99-D:1. The court reasoned that because it had already determined that Myrdek, "in conjunction with his fellow officers, acted . . . within the scope of his employment," and "had a reasonable basis to believe that his conduct was lawful," his conduct could not be deemed wanton or reckless.

Finally, the trial court found that Myrdek was entitled to qualified immunity on the plaintiff's section 1983 claim. The court noted that "[t]he plaintiff's writ alleges that [Lieutenant] Myrdek violated his Fourth Amendment right to be free from unreasonable searches and seizures in that [Lieutenant] Myrdek intentionally or recklessly restrained the plaintiff, without probable cause, for several hours." The court reasoned that, under the circumstances, the plaintiff's right to be free from confinement was not "sufficiently clear," and that Myrdek "had a rational basis for his concern about Ms. Conrad's safety." After observing that courts "consistently recognize the difficulties law enforcement officers face in determining whether particular searches or seizures comport with the Fourth Amendment," the trial court concluded that, given "Myrdek's concomitant and commingled roles of employer and law enforcement officer," Myrdek was entitled to qualified immunity. (Quotation omitted.) The trial court denied the plaintiff's motion for reconsideration, and this appeal followed.

II. Issues on Appeal

The plaintiff argues that the trial court failed to apply the correct standard when it ruled on the defendants' motion for a directed verdict, and erred in granting the motion. The defendants cross-appeal; however, because we affirm the trial court's rulings on immunity, we need not address the cross-appeal.

7

This case involves three types of immunity: sovereign, official, and qualified. "Various concepts of immunity exist under both common law and statutory law to protect governmental entities and public officials from liability for injury allegedly caused by official conduct." Everitt v. Gen. Elec. Co., 156 N.H. 202, 209 (2007). Immunity is based upon the recognition that "certain essential, fundamental activities of government must remain immune from tort liability so that our government can govern." Id. at 210 (quotation omitted).

"Sovereign immunity protects the State itself from suit in its own courts without its consent, and shields it from liability for torts committed by its officers and employees." Id. at 209 (quotations omitted). "With respect to personal liability for public officials and employees, the doctrines of qualified immunity and official immunity provide immunity for wrongful acts committed within the scope of their government employment." Id. Qualified immunity "shields against lawsuits alleging constitutional violations, such as claims brought under 42 U.S.C. § 1983." Id. Official immunity "shields against lawsuits alleging common law torts, such as negligence." Id.

"The goal of official immunity is to protect public officials from the fear of personal liability, which might deter independent action and impair effective performance of their duties." Id. at 215 (quotation omitted). "A genuine need exists to preserve independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits." Id. (quotation and brackets omitted).

> It would be manifestly unfair to place any public official in a position in which he is required to exercise his judgment and at the same time is held responsible according to the judgment of others, who may have no experience in the area and may be much less qualified than he to pass judgment in a discerning fashion or who may now be acting largely on the basis of hindsight.

Id. (quotation and brackets omitted).

Because immunity provides public officials immunity from suit, rather than a mere defense to liability, if at all possible, immunity claims are to be resolved before trial, thereby freeing officials "from the concerns of litigation, including avoidance of disruptive discovery." Ashcroft v. Iqbal, 556 U.S. 662, 685 (2009) (quotation omitted); see Hunter v. Bryant, 502 U.S. 224, 228 (1991) ("Immunity ordinarily should be decided by the court long before trial."); Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). Further, the collateral consequences of potential liability and of mounting a defense, which "include the general costs of subjecting officials to the risks of trial – distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service," are also avoided. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (quotation omitted). Given that "the purpose

8

of immunity is to operate as a bar to a lawsuit," it is "effectively lost if a case is erroneously permitted to go to trial." Everitt, 156 N.H. at 221 (quotation omitted).

## III.  Standard of Review

"A trial court may grant a motion for a directed verdict only if it determines, after considering the evidence and construing all inferences therefrom most favorably to the non-moving party, that no rational juror could conclude that the non-moving party is entitled to any relief." Dillman v. N.H. College, 150 N.H. 431, 434 (2003).  The court "may not weigh the evidence or judge the credibility of witnesses and should deny the motion for a directed verdict unless it can affirmatively determine that the plaintiff is not entitled to any relief on the evidence presented." Clark & Lavey Benefits Solutions v. Educ. Dev. Ctr., 157 N.H. 220, 226 (2008).  We will uphold a trial court's ruling on a motion for a directed verdict "when the record supports the conclusion that the trial court did not commit an unsustainable exercise of discretion." Dillman, 150 N.H. at 434; see Hall v. Dartmouth Hitchcock Med. Ctr., 153 N.H. 388, 393 (2006) (explaining that although made at different points in a trial, "motions for directed verdict and judgment notwithstanding the verdict are essentially the same, and they are governed by identical standards").

Sovereign immunity is a jurisdictional question, LaRoche, Adm'r v. Doe, 134 N.H. 562, 566 (1991), subject to de novo review, see, e.g., In the Matter of Mallett & Mallett, 163 N.H. 202, 207 (2012).  Likewise, qualified immunity is a legal question, which we review de novo.  Snelling  v. City of Claremont, 155 N.H. 674, 684 (2007); see Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 525 (1st Cir. 2009).

In reviewing the qualified immunity ruling, "we construe the facts in the light most favorable to [the plaintiff], and decide legal questions de novo." Wilson v. City of Boston, 421 F.3d 45, 53-54 (1st Cir. 2005).  "[I]t makes little difference that we review the qualified immunity question after trial instead of before it . . . .  [T]he procedural posture . . . does not greatly influence the standard of review." Id. (quotation and brackets omitted); see Porter v. City of Manchester, 151 N.H. 30, 48 (2004) ("When a qualified immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial." (quotation omitted)).

## IV.  Legal Standard – Qualified Immunity

The plaintiff argues that the trial court "violated the correct standard of review required when conducting a qualified immunity inquiry after a jury verdict."  He asserts that in a Fourth Amendment case "[w]hen a defense of qualified immunity is pressed after a jury verdict, . . . the evidence must be construed in the light most hospitable to the party that prevailed at trial," and

"deference should be accorded to the jury's discernible resolution of disputed factual issues," quoting Jennings v. Jones, 499 F.3d 1, 7 (1st Cir. 2007) (emphasis and quotations omitted). According to the plaintiff, "[t]he post-verdict standard of review requires the trial court to give deference to the jury's determination of facts that should be controlling in the immunity analysis" and, therefore, "the trial court is required to apply those findings of fact in conducting the immunity analysis." (Emphases omitted.)

In response, the defendants argue that the plaintiff's "assertion that the jury was instructed on the immunity issue and found that the defendants could not have reasonably believed it was lawful to detain [him] is incorrect." The defendants assert that "[w]hile the facts are considered in the light most favorable to the [p]laintiff, the immunity question was for only the trial court to decide." (Emphasis omitted.) Thus, they contend, "the question on appeal is not whether the jury could have found that the Defendants did not reasonably believe their conduct to be lawful, but rather whether the trial court could have found that the Defendants reasonably believed that their conduct was lawful." (Emphases omitted.)

As the United States Court of Appeals for the First Circuit has observed regarding claims of qualified immunity under federal law, "the Supreme Court has not clearly indicated whether the judge may act as fact-finder when there is a factual dispute underlying the qualified immunity defense or whether this function must be fulfilled by a jury." Kelley v. LaForce, 288 F.3d 1, 7 n.2 (1st Cir. 2002). The trial court concluded that it "need not resolve this issue . . . because the plaintiff cannot prevail on the immunity issue on the evidence presented" during the jury trial. Accordingly, after explicitly noting that the plaintiff had met his burden at trial of proving the elements of false imprisonment, the trial court proceeded to "bas[e] its [immunity] analysis on the trial record viewed in the light most favorable to the plaintiff." We find no error in the standard applied by the trial court.

V.  Qualified Immunity as to Myrdek

We first consider the plaintiff's argument that the trial court erred in granting a directed verdict on his section 1983 claim. Section 1983 provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution. Collins v. Harker Heights, 503 U.S. 115, 120 (1992). Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

10

injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

According to the plaintiff, the claim against Myrdek is "based on his unlawful and unreasonable seizure of the plaintiff in his office for the purpose of forcing the plaintiff to participate in an employment-related internal investigation." The plaintiff asserts that his claim "is based on [Myrdek's] refusal to recognize [his] right to discontinue [the] investigatory interview and leave based on (1) his right to union representation, and (2) his right to resign immediately." Thus, he argues, "Myrdek's demand that [he] submit to an interview prior to 3:00 p.m. . . . resulted in multiple instances of unlawful confinement . . . in violation of [his] constitutional rights."

The plaintiff acknowledges that his first two encounters with Myrdek – at 2:05 p.m., when he received the Garrity warning, and at approximately 2:30 p.m., when he returned to Myrdek's office to report on his efforts to arrange union representation – "are not and never were part of [his] claim of false imprisonment." Rather, he asserts that his "unlawful confinement started during his third meeting in Myrdek's office, which began at 2:45 to 3:00 p.m., and then continued into the hallway." (Emphasis omitted.) Thus, we limit our qualified immunity analysis to the third meeting beginning at approximately 2:45 p.m.

"The doctrine of qualified immunity provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. § 1983 for infringing the constitutional rights of private parties." Whitfield v. Melendez-Rivera, 431 F.3d 1, 6 (1st Cir. 2005). Qualified immunity protects police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Mlodzinski v. Lewis, 648 F.3d 24, 32 (1st Cir. 2011) (quotation omitted). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

"The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. (quotation omitted). The doctrine "is a compromise that strives to balance the desire to compensate those whose rights are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, although unfounded, may nevertheless be unbearably disruptive." Whitfield, 431 F.3d at 6 (quotation

11

and brackets omitted).  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

The qualified immunity inquiry is comprised of a two-part test.  See Maldonado, 568 F.3d at 268-69.  Pursuant to that test, a court must decide:

> (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation.
>
> It is clear from the Supreme Court's description of the second, "clearly established" step of the qualified immunity analysis that the second step, in turn, has two aspects.  One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation . . . .  The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights.

Id. at 269 (citations omitted).  "If even on plaintiff['s] best case, there is no violation of [his] rights, or the law was not clearly established, or an objectively reasonable officer could have concluded (even mistakenly) that his or her conduct did not violate [the plaintiff's] rights, then qualified immunity must be granted."  Mlodzinski, 648 F.3d at 28.

"[W]hile it is frequently appropriate for courts to answer each step in turn, it is not mandatory that courts follow the two-step analysis sequentially."  Maldonado, 568 F.3d at 269-70.  Courts may exercise discretion in deciding which of the prongs "of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson, 555 U.S. at 236; see Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014).  In some cases, "discussion of the first prong of the qualified immunity analysis will result in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case."  Maldonado, 568 F.3d at 270 (quotation omitted).  "This expenditure of resources by the courts and the parties is difficult to justify in cases where the constitutional questions presented are heavily fact-bound, minimizing their precedential value."  Id.

For purposes of its qualified immunity analysis, the trial court assumed that the plaintiff had established "a cognizable constitutional violation under the Fourth Amendment."  On appeal, Myrdek likewise assumes that the plaintiff has "satisfied the first prong of the test."  Accordingly, we will assume, without deciding, that Myrdek's conduct violated the plaintiff's Fourth Amendment right to be free from unreasonable seizure.

12

Under the second prong of the qualified immunity analysis, the trial court determined that the plaintiff's right to be free from confinement under the circumstances in this case "was not clearly established," and that "the officers had a reasonable basis to believe that their conduct was lawful." The plaintiff asserts that because the jury rendered a verdict in his favor on the false imprisonment claim, it necessarily found: that his resignation was valid and not tainted by the defendants' suggestion that it was "irrational"; that the circumstances presented "did not give rise to a reasonable suspicion that [he] presented an immediate danger of bodily harm to himself or others prior to his detention"; and that "Myrdek did not have an objectively reasonable basis . . . to believe that there was any emergency at hand which necessitated restraining [his] liberty." (Emphases and quotation omitted.) The plaintiff argues that the trial court "simply ignored" the jury's findings that Myrdek's conduct was not objectively reasonable. We disagree.

The linchpin of qualified immunity is the objective reasonableness of the official's conduct. Anderson v. Creighton, 483 U.S. 635, 638-39 (1987). In Anderson, the plaintiffs argued that it was "inappropriate to give officials alleged to have violated the Fourth Amendment – and thus necessarily to have unreasonably searched or seized – the protection of a qualified immunity intended only to protect reasonable official action" because, they asserted, it is impossible "to say that one 'reasonably' acted unreasonably." Id. at 643. The United States Supreme Court rejected this argument, stating: "The short answer to this argument is that it is foreclosed by the fact that we have previously extended qualified immunity to officials who were alleged to have violated the Fourth Amendment." Id. Thus, even if an officer is found to have acted unlawfully, "Anderson still operates to grant officers immunity for reasonable mistakes as to the legality of their actions." Saucier v. Katz, 533 U.S. 194, 206 (2001). "This test imposes an objective standard of reasonableness." Mlodzinski, 648 F.3d at 33; see Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The plaintiff argues that, during his third meeting with Myrdek, which began at 2:45 to 3:00 p.m., "Myrdek did not have any objectively reasonable basis to confine [him] to his office," and that Myrdek's "only 'purpose' was to unlawfully compel [him] to submit to a no-notice interview without the union counsel he was legally entitled to." The plaintiff asserts that he "simply refused to answer questions at 3 p.m. without his union representative being present which is lawful and appropriate behavior under the defendants' own rules." (Emphasis omitted.) Myrdek argues that the plaintiff "provides no legal support for his argument that [he] had an 'absolute right' to have the union attorney, as opposed to any other union representative, present at the administrative interview." Myrdek asserts that "[b]ased on the information available to [him] at the time, he reasonably believed that the interview should not be delayed."

The state police "Professional Standards of Conduct" (standards) set forth the procedures applicable to "internal affairs investigations concerning allegations of personnel misconduct." Pursuant to section 26-E.4.5, C, "Division Member Rights and Responsibilities":

1. Division members under administrative investigation shall have the right to association or union representation during an investigative interview, if so requested by the member, whenever the member reasonably believes that the interview may result in disciplinary action against him. The association or union representative's role at the investigative interview is to consult with the Division member. The association or union representative shall not participate in the interview in any way unless requested to do so by the investigator and shall not convert the interview into an adversary proceeding. The Division is free to insist upon hearing the Division member's own account of the matter(s) under investigation.

2. The Division member is solely responsible for making arrangements to have an association or union representative in attendance at the interview. Under no circumstances will the investigation be compromised or unreasonably delayed because of the Division member's, association's or union's failure to obtain or provide an association or union representative in a timely manner.

Thus, under section 26-E.4.5, C of the standards, assuming that the plaintiff reasonably believed that the interview with Myrdek might result in disciplinary action against him, the plaintiff had a right to "association or union representation" during the investigative interview. However, there is no mention in the standards of a right to specific representation by an individual of the member's choosing, nor does the plaintiff cite any authority in support of his position that he was legally entitled to have the union <u>attorney</u> present at his interview. Cf. <u>Appeal of Exeter Police Assoc.</u>, 154 N.H. 61, 64 (2006) (declining to express opinion on whether New Hampshire law affords an employee the right to request the union representative of one's choice); <u>see</u> <u>Anderson</u>, 483 U.S. at 639 (explaining that application of qualified immunity "turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken") (quotations and citations omitted).

Further, the policy expressly provides that the investigation not be "compromised or unreasonably delayed" because of the member's failure to obtain "an association or union representative in a timely manner." At the time of the third meeting with the plaintiff on November 28, Myrdek was: aware of the events that had taken place in September regarding the plaintiff's actions

14

involving the Meredith Police Department; aware of events that had resulted in the plaintiff being placed on administrative leave in October; aware that two days before, the plaintiff's wife had called the Laconia Police Department after arguing with her husband, requesting additional patrols by her home; aware that the plaintiff's wife had expressed concern that the plaintiff had been in her home in violation of a temporary order; and aware that the plaintiff had told his wife he knew where her attorney lived. Based upon the facts known to him at the time, it was objectively reasonable for Myrdek to conclude that insisting that the investigatory interview take place that day, and that the plaintiff arrange for union representation other than Donchess, did not violate the plaintiff's rights.

The plaintiff further argues that "any reasonable officer in Myrdek's position . . . would have recognized that he had no reasonable, lawful basis to compel [him] to participate in a Garrity internal investigatory interview contrary to . . . his right to resign his employment and leave." We disagree. When Myrdek informed the plaintiff that the investigatory interview was going to take place that day, the plaintiff became enraged and tried to hand Myrdek a resignation letter. When Myrdek refused to accept it, the plaintiff responded, "Well, F you . . . I'm leaving, I quit." Myrdek testified that he didn't accept the plaintiff's resignation "because [he] felt that in [the plaintiff's] state of rage that he . . . seemed to be . . . going out of control, and [he] didn't think that [the plaintiff] was at that point making a rational decision." Faced with the fact that the plaintiff's behavior had rapidly escalated to an enraged state, it was objectively reasonable for Myrdek to consider the plaintiff's offer to resign as not the product of a rational act.

We reject the plaintiff's contention that prior to 3 p.m. Myrdek was not acting as a "police officer," but rather "was acting solely in his capacity as the employer." Such a characterization ignores that, at all times relevant to the issues before us, both Myrdek and the plaintiff were armed, on-duty law enforcement officers, a factor that necessarily informed Myrdek's actions. For example, explaining why he declined to accept the plaintiff's offer to hand over his gun during the "very quick" third meeting in his office, Myrdek testified:

> [I was] concerned about . . . taking . . . [the plaintiff's] weapon away from him. But I was contemplating maybe just disarming that weapon by just removing the magazine, which would make the weapon unserviceable. In other words, you couldn't fire the weapon if I had just removed the magazine. And I was contemplating, at what point do I do this? Is this going to excite him even more? Will I be able to calm him down? So I was going through a number of scenarios that I was trying to determine what to do.
>
> . . . .

15

I had concerns the entire time as to what point do I try to remove that weapon from him without exciting him any further? And trying to calm him down at the same time. And I was trying to balance out how to do that and when to do that.

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving[.]" Graham v. Connor, 490 U.S. 386, 396-97 (1989). An officer who makes "a reasonable judgment call" is entitled to qualified immunity. Buchanan v. Maine, 469 F.3d 158, 170 (1st Cir. 2006); see Saucier, 533 U.S. at 205 (cautioning against "the 20/20 vision of hindsight in favor of deference to the judgment of reasonable officers on the scene" (quotation omitted)).

We conclude that an objectively reasonable officer could have believed that refusing to postpone the plaintiff's investigatory interview and refusing to accept the plaintiff's resignation were lawful. Thus, "even on plaintiff['s] best case . . . an objectively reasonable officer could have concluded (even mistakenly) that his . . . conduct did not violate [the plaintiff's] rights." Mlodzinski, 648 F.3d at 28. Accordingly, we hold that Myrdek was entitled to qualified immunity.

The plaintiff further argues that the trial court erroneously concluded that he was not entitled to a jury trial on his section 1983 claim. However, given our conclusion that the trial court correctly determined that Myrdek was entitled to qualified immunity on the section 1983 claim, we need not address this argument.

VI.  Sovereign Immunity

The trial court concluded that NHDS was entitled to sovereign immunity and Myrdek was entitled to official immunity on the false imprisonment claim. On appeal, the plaintiff does not challenge the court's ruling that Myrdek was entitled to official immunity; therefore, we limit our review to whether the trial court erred in granting a directed verdict in favor of NHDS on grounds of sovereign immunity.

The plaintiff argues that under the circumstances, his approximately two-hour detention at state police headquarters was unreasonable because the defendants did not initiate an Involuntary Emergency Admission (IEA) process, and "the defendants created their own alleged 'caretaker role' and then tried to get out of it." NHDS argues that the record supports the trial court's conclusion that the officers acted within the scope of their employment and reasonably believed that their acts were lawful.

"The doctrine of sovereign immunity is deeply entrenched in this jurisdiction." Opinion of the Justices, 126 N.H. 554, 557 (1985) (quotation omitted). "Sovereign immunity is a jurisdictional question not to be waived by conduct or undermined by estoppel." LaRoche, 134 N.H. at 566 (quotation omitted). It is not a defense which must be affirmatively pled. Id. As noted above, sovereign immunity is a question of law which we review de novo.

In enacting RSA chapter 541-B, the legislature waived the State's sovereign immunity, subject to several exceptions. One such exception is contained in RSA 541-B:19, I(d) (2007), which provides that the State has immunity from

> [a]ny claim arising out of an intentional tort, including . . . false imprisonment . . . provided that the employee whose conduct gives rise to the claim reasonably believes, at the time of the acts or omissions complained of, that his conduct was lawful, and provided further that the acts complained of were within the scope of official duties of the employee for the state.

Thus, to establish the State's intentional tort liability, a plaintiff must prove that, while acting within the scope of his official duties, the offending State employee lacked a reasonable belief in the lawfulness of his conduct. As we have explained, "[t]o hold the State liable when the employee or official reasonably believes that his conduct conforms to the law would in our opinion have a chilling effect on the morale and motivation of government personnel." Opinion of the Justices, 126 N.H. at 564. "Given the societal importance of maintaining vigilant government personnel, we believe that the State is not constitutionally compelled to expose itself to liability for intentional torts committed by government officials or employees who act under a reasonable belief in the lawfulness of their conduct." Id.

The trial court concluded that "the NHDS officers acted within the scope of their duties" under RSA 541-B:19, I(d), both "in their capacity as employers" and "within their law enforcement capacities." The record supports the trial court's conclusion and the plaintiff does not argue otherwise. Accordingly, the statutory requirement that "the acts complained of were within the scope of official duties of the employee for the state" is satisfied. RSA 541-B:19, I(d).

The trial court also found that "an objective analysis compels a finding that the NHDS officers had a reasonable basis to believe that their conduct" in confining the plaintiff to police headquarters until the Concord police arrived "was lawful," based upon a reasonable concern "about the safety of the plaintiff and others based on the plaintiff's manifest behavior." The plaintiff argues that under the circumstances, the NHDS officers' conduct was unreasonable because they did not initiate an IEA even though they detained him. NHDS argues that based upon the plaintiff's conduct and demeanor, it was

17

reasonable to believe that he posed an immediate danger of bodily injury to himself and should be held in protective custody until a determination could be made as to whether an IEA should be ordered.

> Pursuant to RSA 135-C:28, III (Supp. 2013):
>
> When a peace officer observes a person engaging in behavior which gives the peace officer reasonable suspicion to believe that the person may be suffering from a mental illness and probable cause to believe that unless the person is placed in protective custody the person poses an immediate danger of bodily injury to himself or others, the police officer may place the person in protective custody. Any person taken into protective custody under this paragraph shall be transported directly to an emergency room of a licensed general hospital . . . for the purpose of determining if an involuntary emergency admission shall be ordered . . . . The period of protective custody shall end when a physician or [advanced registered nurse practitioner] makes a determination as to whether involuntary emergency admission shall be ordered or at the end of 6 hours, whichever event occurs first.

The plaintiff testified that during the approximately two-hour period when he was held in custody by NHDS, he was "angry," "depressed," and "suicidal." According to the testimony of the officers who were with the plaintiff in Myrdek's office, the plaintiff threatened to take one of the officer's guns away from him. The plaintiff said to another officer that he was going to make that officer shoot him. At one point, the plaintiff got "into a fighting stance in which he . . . had one fist clenched, the other fist open." Captain Allen Welch testified that the plaintiff threatened to jump out the window and commit suicide, causing Welch to draw his taser.

Forey testified that during the struggle in the hallway, the plaintiff was "clearly a dangerous person at that point." She testified that she was "concerned with his mindset and the fact that [they were] all wearing weapons," and "concerned for the safety of the civilians" in the building, and she testified that "he was a threat to himself and others." Welch, who stayed in Myrdek's office with the plaintiff, testified that the plaintiff "had lost control of himself emotionally and physically" and needed to be in custody that afternoon. Welch testified that his "sole goal in this entire incident was to get out of there with nobody getting hurt." Corporal Stephen Barrett, who was also in Myrdek's office with the plaintiff, testified that he was concerned that, if allowed to leave, the plaintiff might harm himself or his wife. Barrett testified that, in his thirty years as a state trooper, he had never witnessed a physical altercation between a trooper and his superior resulting in restraint, or a fellow trooper saying that he wanted to kill himself or wanted to be shot.

18

The policy considerations that support shielding police officers from liability in the related context of official immunity are important and worth repeating:

> Police officers are trusted with one of the most basic and necessary functions of civilized society, securing and preserving public safety. . . . Police officers are regularly called upon to utilize judgment and discretion in the performance of their duties. They must make decisions and take actions which have serious consequences and repercussions to the individuals immediately involved, to the public at large and to themselves. On any given day, they are required to employ their training, experience, measured judgment and prudence in a variety of volatile situations . . . .

> Further, law enforcement by its nature is susceptible to provoking the hostilities and hindsight second-guessing by those directly interacting with police as well as by the citizenry at large. Police officers, as frontline agents for the executive branch, are particularly vulnerable to lawsuits, whether the underlying police conduct or decision was errant or not. . . . The public simply cannot afford for those individuals charged with securing and preserving community safety to have their judgment shaded out of fear of subsequent lawsuits or to have their energies otherwise deflected by litigation, at times a lengthy and cumbersome process.

Everitt, 156 N.H. at 217-18.

We conclude that under the circumstances, a reasonable officer would have believed that, based upon the plaintiff's behavior and statements, holding the plaintiff in protective custody at police headquarters, until the determination was made to have a neutral police department take custody, was lawful because the plaintiff posed "an immediate danger of bodily injury to himself or others." Accordingly, we hold that the elements of RSA 541-B:19, I(d) have been satisfied, and that NHDS is entitled to sovereign immunity.

Affirmed.

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.

19